[DO NOT PUBLISH]

# In the
# United States Court of Appeals
## For the Eleventh Circuit

_____

No. 24-10656

Non-Argument Calendar

_____

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

*versus*

JOSEPH A. VALDEZ,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Florida
D.C. Docket No. 1:23-cr-00014-AW-MAL-1

_____

Before ROSENBAUM, BRANCH, and ABUDU, Circuit Judges.

PER CURIAM:

Joseph Valdez appeals his total sentence of 96 months' imprisonment imposed after he pleaded guilty to wire fraud, aggravated identity theft, and stalking. He argues that his sentence, which was an upward variance from the applicable guidelines range, is substantively unreasonable because the district court improperly weighed the relevant sentencing factors. After review, we affirm.

## I.     Background

A grand jury indicted Valdez on five counts of wire fraud, in violation of 18 U.S.C. §§ 2, 1343; three counts of aggravated identity theft in violation of 18 U.S.C. §§ 2, 1028A(a)(1); and three counts of stalking in violation of 18 U.S.C. § 2261A(2)(B). Pursuant to a written plea agreement, he pleaded guilty to one count each of wire fraud, aggravated identity theft, and stalking.[1]

According to the stipulated factual basis for his plea, using online information and social media platforms Valdez "identified young adult females throughout the United States," obtained their phone numbers, and then attempted to access their Snapchat accounts. He gained access to the accounts by submitting a password reset request to Snapchat by entering the victims' phone

---

[1] As part of his plea agreement, Valdez "reserve[d] the right to appeal any sentence imposed."

numbers, which prompted Snapchat to send the victims a verification code. At the same time, Valdez reached out to the victims via a randomized number texting app pretending to be a representative of Snapchat. He would convince the victims to provide the verification code to him, which he then used to reset their passwords and gain access to their accounts. Once he gained access, he copied their photographs, including privately saved nude photographs. He then contacted the victims and taunted them about how he had their private photographs, commented on their bodies, and attempted to blackmail them.

For instance, in December 2021, one college student victim, L.R., reported to police that

> someone from a random phone number seems to have hacked into my phone information and is blackmailing me with explicit photos saying "I have your nudes, and some other exciting stuff, if you don't want your friends, family, and school to see it, do some favors for me. Ignore and I share anyway." They sent two pictures as proof. They've texted me since twice and I'm concerned if I don't respond or do something about it they will send things out anyway.

In one of the images sent to L.R. as proof, she was "topless" and "under the age of 18" when the image was taken. A second college student, K.M., reported a similar encounter in which she received a blackmail message from a random number that stated, "Just someone with some unflattering pics of you, wondering who I

should send them to, any ideas?" Another message read, "Always wanted to see what your tits looked like. Should I show everyone?" And a third victim, S.U., was contacted multiple times and an anonymous number sent her a picture of her "bare buttocks, along with a message that read 'just an absolutely incredible ass.'"

Law enforcement ultimately traced the anonymous texting app subscriber records, IP addresses, and related e-mail accounts to Valdez. The fake text messages purporting to be from Snapchat to victims were found on Valdez's electronic devices along with step-by-step instructions on how to hack social media profiles. Valdez was also a member of online forums with other individuals that focused on similar schemes and in these forums members traded and shared stolen images with each other.

Valdez's presentence investigation report ("PSI") indicated that Valdez had been identified as a suspect in 2017 and 2019 in Illinois state cases involving similar conduct. For instance, in 2019, C.B. contacted police in Illinois and reported that she had been the victim of a Snapchat phishing scheme, and she was later sent a nude image from her account." Investigators traced the IP address to Valdez's home but were unable to make contact with the residents of that home. Valdez was also identified as a suspect in relation to a 2017 incident in which it was alleged that he posed as a female on Tinder and developed an online relationship with another woman who sent him explicit pictures. Valdez then posted the pictures on another internet website. Similarly, a college student, E.F., reported to university police that she was solicited by a Snapchat

user to send naked photographs in exchange for money. She did so, but was never paid, and the photographs were later posted online.

As for the current federal offenses, the PSI indicated that law enforcement identified at least 18 specific victims of Valdez's scheme (one of whom was his own cousin). Valdez faced a total combined statutory maximum of 27 years' imprisonment. His applicable guidelines range was 18 to 24 months, plus a mandatory consecutive term of 24 months' imprisonment for the aggravated identity theft count. In other words, his total advisory guidelines range was 42 to 48 months' imprisonment.

The report stated the following regarding Valdez's background. Valdez was born in 1993, and his father was not a part of his life. Valdez and his mother lived with his grandparents in Chicago for the first seven years of Valdez's life. He and his mother then moved in with his mother's friend for one year, before having to move back to his grandparents' home. They moved out again in 2004, and his mother remarried in 2005, and Valdez considered his stepfather to be his actual father. In 2012, the family had some financial troubles and were evicted from their home and moved back in with his grandparents, where they had to sleep on the floor. Valdez attended college for nine semesters, but he did not graduate. Valdez married his wife in 2022. Valdez was "a functioning alcoholic" and had previously used cocaine "heavily" in 2018, but only used it occasionally after 2018. He had no history

of mental health issues, and he consistently maintained employment since May 2016.

Six victims submitted impact statements which described how the crime had affected them. These victims generally described experiencing fear and feeling a lack of safety and security. Others described more serious effects, such as anxiety so severe that the victim stopped attending in-person college classes and started taking all her classes remotely, and another describing experiencing nightmares and loss of sleep.

The government filed a sentencing memorandum, requesting an upward variance from the guidelines range, citing the egregious nature and seriousness of Valdez's offenses, the need to promote respect for the law and provide appropriate punishment, and the need for general and specific deterrence. Valdez in turn requested a below-guidelines sentence, citing his acceptance of responsibility, his cooperation, his unstable childhood and history of alcoholism, and letters of support from his wife, family, and friends. He maintained that he would not commit another crime again as demonstrated by his lack of criminal history prior to this offense, that he was committed to addressing the issues that contributed to his behavior, and that any general deterrence needs were satisfied by the charges brought against him.

At sentencing, the government called one of the detectives in the case to testify. He stated that, in addition to the 18 identified victims, there were 23 unidentified victims in this case. Additionally, the investigation revealed that Valdez had contacted

over 700 phone numbers using the texting app, but the detective could not say how many of the numbers contacted were working numbers or actually responded to Valdez. Valdez sent the phishing Snapchat text message "thousands of times over a period of months, if not a year." Each picture sent through Valdez's Snapchat account showed a woman nude, partially nude, or engaged in a sex act. The detective was able to confirm with the 18 identified victims that the nude images sent to them were in fact of them and were stolen from their Snapchat accounts. The detective discovered the stolen nude images of at least one victim had been posted on a website with the victim's name, but the detective could not say who had posted the material to the website.

Following the detective's testimony, Valdez's counsel reiterated his arguments for a below-guidelines sentence, emphasizing that Valdez understood the seriousness of his offense, accepted responsibility, cooperated with authorities, and had reflected on his actions and was very remorseful. He argued that three and a half to four years—the applicable guidelines range plus the applicable consecutive mandatory minimum—was "a long time" for someone with no prior criminal history.

The district court acknowledged that a low sentence might be appropriate for Valdez if the court were focused just on specific deterrence, but the court had to consider the need for general deterrence as well, which was "a big factor" that weighed against his request for a below-guidelines sentence. The district court emphasized that these types of schemes cause "tremendous harm

to these young women, and a lot of it happens by people who don't have criminal records and people are, you know, sitting at home in their basements online behind fake identities and things like that." The court also emphasized that there were a number of "significant aggravating factor[s]" in this case, including "the harm to the victims," "the number of attempt[ed]" contacts by Valdez, and Valdez's motivation behind his conduct, which seemed to be "to intentionally terrorize these women."

Valdez's counsel emphasized that, although there may have been aggravating factors, there were a number of mitigating factors, emphasizing Valdez's unstable childhood, frequent moves, and financial instability. Yet, Valdez "pulled himself up" and made himself employable and "otherwise rather law abiding," which spoke to his good character. His counsel further emphasized as mitigating factors that Valdez had alcohol dependency and past drug abuse and opined that Valdez may have some unspecified mental health issues given the government's contention that Valdez "was doing this for some other reason that wasn't monetary." However, Valdez's counsel admitted that Valdez initially got involved with the scheme for monetary reasons, but it "escalated past what it was supposed to be." His counsel also pointed out that Valdez's wife and mother were still standing by him and actively supporting him despite his conduct. Valdez then made a statement, expressing his significant remorse for his actions and that he planned to turn his life around and be a "force of good." He also noted that, while incarcerated, he took proactive steps toward rehabilitation, participating in a 12-step program to

understand the underlying root of his issues with alcohol, which he believed contributed to his clouded judgment and uncharacteristic behavior in this case.

In response, the government argued that the district court could not "ignore the crimes" and the fact that Valdez had been engaging in similar conduct long before this case. It noted that, although Valdez was willing to cooperate, the information he provided was not useful and he had not been as cooperative as he implied—for instance, he had refused to provide the passcode for his phone. The government emphasized that there were 18 identified victims, 23 unidentified victims, and over 700 potential victims whom Valdez contacted from 2021 through December 2022, which demonstrated that his actions were more than a lapse in judgment or an alcohol-fueled decision. The government reasserted that the guidelines did not account for the number of victims and their emotional trauma, noting that Valdez could have simply hacked their accounts and stolen their pictures without detection, but he "chose to make sure they knew he had their images, and he then commented on their bodies in a crude manner." The government maintained that the aggravating factors outweighed the mitigating factors and warranted an upward variance.

The district court varied upward and imposed a sentence of 96 months' imprisonment to be followed by three years' supervised release. The court explained that it had considered "all of the [18 U.S.C. §] 3553(a) factors" and all the evidence before it, including

the arguments made during the hearing, the sentencing memoranda, the PSI, the letters in support of Valdez, and the victim impact statements. However, the court concluded that there were "a lot of aggravating factors that [were] not picked up in the guidelines," such as the number of victims involved; the length of time the scheme went on; the "level of harm" suffered; the "hundreds and hundreds more" people that Valdez contacted and attempted to do the same thing to; the sophisticated nature of the crime; "the viciousness of the conduct"; and that Valdez "enjoyed torturing these women." The district court explained that the sentence reflected the seriousness of the offense, provided adequate punishment, furthered the general deterrence objectives, and was necessary to protect the public. Finally, the court noted that it had considered Valdez's arguments in mitigation, including his acceptance or responsibility, remorse, cooperation, family support, the details about his background and childhood, and his drug-alcohol history. Valdez objected to the sentence, asserting that it did "not accurately reflect the § 3553(a) factors." This appeal followed.

## II.    Discussion

Valdez argues that the district court improperly weighed the relevant sentencing factors, failed to consider who Valdez was as a person, and imposed an "overly harsh sentence." In support of his position, he points out that the district court discussed the

24-10656                Opinion of the Court                11

"perceived aggravators in great detail," but only briefly discussed the mitigating factors, "and even left some out."

We review the substantive reasonableness of a sentence under a deferential abuse of discretion standard, asking whether the sentence is reasonable in light of the totality of the circumstances. *Gall v. United States*, 552 U.S. 38, 51 (2007). "A district court commits a clear error of judgment when it weighs the § 3553(a) sentencing factors unreasonably." *United States v. Butler*, 39 F.4th 1349, 1355 (11th Cir. 2022).

The district court must issue a sentence that is "sufficient, but not greater than necessary" to comply with the purposes of § 3553(a)(2), which include the need for a sentence to reflect the seriousness of the offense, promote respect for the law, provide just punishment, deter criminal conduct, and protect the public from future criminal conduct. 18 U.S.C. § 3553(a)(2). In determining the appropriate sentence, the district court must also consider the "nature and circumstances of the offense and the history and characteristics of the defendant"; the guidelines range; the "kinds of sentences available"; "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct"; and "the need to provide restitution." *Id.* § 3553(a)(1), (3)–(4), (6)–(7).

Importantly, the weight given to a particular § 3353(a) factor "is committed to the sound discretion of the district court," and it is not required to give "equal weight" to the § 3553(a) factors. *United States v. Rosales-Bruno*, 789 F.3d 1249, 1254 (11th Cir. 2015)

(quotation omitted). "We will not second guess the weight given to a § 3553(a) factor so long as the sentence is reasonable under the circumstances." *Butler*, 39 F.4th at 1355. The burden rests on the party challenging the sentence to show "that the sentence is unreasonable in light of the entire record, the § 3553(a) factors, and the substantial deference afforded sentencing courts." *Rosales-Bruno*, 789 F.3d at 1256.

"Upward variances are imposed based upon the § 3553(a) factors." *Butler*, 39 F.4th at 1355. No presumption of reasonableness or unreasonableness applies to a sentence that lies outside the advisory guidelines range. *Id.* "When imposing a variance, a district judge must give serious consideration to the extent of any departure from the [g]uidelines and must explain [its] conclusion that an unusually lenient or an unusually harsh sentence is appropriate in a particular case with sufficient justifications." *Id.* (quotations omitted). In reviewing the reasonableness of such a sentence, we "may consider the extent of the deviation, but must give due deference to the district court's decision that the § 3553(a) factors, on a whole, justify the extent of the variance." *Gall*, 552 U.S. at 51.

We will "vacate the sentence if, but only if, we are left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *United States v. Irey*, 612 F.3d 1160, 1190 (11th Cir. 2010) (*en banc*) (quotations omitted).

Here, the district court did not abuse its discretion in varying upward from the applicable guidelines range of 42 to 48 months' imprisonment and imposing a sentence of 96 months' imprisonment. The district court explained that an upward variance was appropriate because of the seriousness of the nature and circumstances of the offense, the need for punishment and deterrence as well as the need to protect the public, and it supported its decision with adequate justification—namely, the highly aggravating circumstances present in this case. Thus, the district court correctly considered the particularized facts of the case and acted within its discretion in giving more weight to certain sentencing factors over others. 18 U.S.C. § 3553(a)(1); *Rosales-Bruno*, 789 F.3d at 1254. The district court's lengthy explanation established that it considered the relevant § 3553(a) factors, including Valdez's personal history and characteristics. Although the district court may not have discussed all of Valdez's mitigating evidence, "[a] district court's failure to discuss mitigating evidence does not indicate that the court erroneously ignored or failed to consider th[e] evidence." *Butler*, 39 F.4th at 1356 (quotations omitted). "Rather, a district court's acknowledgment," like the one here, "that it has considered the § 3553(a) factors and the parties' arguments is sufficient." *Id.*

Finally, we note that Valdez's 96-month sentence is well-below the statutory maximum of 27 years' imprisonment, which is another indicator of reasonableness. *See United States v. Gonzalez*, 550 F.3d 1319, 1324 (11th Cir. 2008) (explaining that a sentence that is below the statutory maximum is an indicator of reasonableness).

Accordingly, we are not "left with the definite and firm conviction that the district court committed a clear error of judgment in weighing the § 3553(a) factors by arriving at a sentence that lies outside the range of reasonable sentences dictated by the facts of the case." *Irey*, 612 F.3d at 1190 (en banc) (quotations omitted). Consequently, we conclude that Valdez's sentence is substantively reasonable, and we affirm.

**AFFIRMED.**